**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| PERSONAL AUDIO, LLC, | |
|     Plaintiff, | |
|     v. | 2:13-cv-00270-JRG-RSP |
| CBS CORPORATION, | JURY TRIAL DEMANDED |
|     Defendant. | |

## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OF NON-INFRINGEMENT

Defendant CBS Corporation ("Defendant"), by and through its counsel, respectfully moves this Court to grant Judgment as a Matter of Law in its favor, pursuant to Federal Rule of Civil Procedure 50(a).

## I.    INTRODUCTION

Plaintiff Personal Audio, LLC. ("Personal Audio" or "Plaintiff) has now been fully heard on its infringement claims based on U.S. Patent No. 8,112,504 ("the '504 patent") against Defendant CBS.  Personal Audio did not present legally sufficient evidence for a reasonable jury to find the patent-in-suit infringed.  Moreover, Defendant has produced affirmative evidence establishing that it does not infringe the '504 patent.  This Court should therefore grant judgment as a matter of law in favor of Defendant. Fed. R. Civ. P. 50(a); *Anthony v. Chevron United States*, 284 F.3d 578, 582-83 (5th Cir. 2002).

## II.    LEGAL STANDARD

Judgment as a matter of law is warranted where a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1);

1

*see also Adams v. Groesbeck Indep. Sch. Dist.*, 475 F.3d 688, 690 (5th Cir. 2007).[1]    The Supreme Court has explained that the "standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  As such, judgment as a matter of law is appropriate when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997).  The party opposing the motion must provide actual evidence, not "mere speculation and conjecture." *Anthony v. Chevron United States*, 284 F.3d 578, 583 (5th Cir. 2002).  Likewise, a mere scintilla of evidence is insufficient to present an issue to the jury.  *Id.*

Dr. Almeroth's testimony does not suffice. Conclusory expert testimony does not qualify as substantial evidence. *See Iovate HealthSciences, Inc. v. Vio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1381-82 (Fed. Cir. 2009) (applying Fifth Circuit law). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). In sum, judgment as a matter of law is warranted.

## III.   ARGUMENT

### A.   Personal Audio Failed to Provide Evidence to Support a Verdict of Direct Infringement

"To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims." *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703,

---

[1] In the Fifth Circuit, the appellate court reviews a trial court's denial of a judgment as a matter of law *de novo*.  *Id.*

716 (E.D. Tex. 2011).  Judgment as a matter of law of no infringement is appropriate when no reasonable fact finder could determine "that the accused devices meet every limitation of the properly construed claims." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980-981 (Fed. Cir. 1999); *see also Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1343 (Fed. Cir. 2013) (reversing the district court's denial of JMOL for non-infringement) (applying Fifth Circuit law).  Where, as here, there is not a legally sufficient evidentiary basis that Defendant made, used, or sold an apparatus with each limitation of the asserted claims, judgment as a matter of law is appropriate.

### 1.     Personal Audio Failed to Prove that Defendant Infringes Under 35 U.S.C. § 271(a)

Personal Audio bears the burden of proving infringement.  The facts demonstrate that judgment as a matter of law of non-infringement is warranted.  The asserted claims require that the apparatus include a location that stores the media files and responds to requests for media files.  *See* Claim 31.  No server owned or operated by Defendant is used to store the accused media files and to respond to the requests for media files.  *See, e.g.*, 9/10/14 PM Tr. at 23-29 (testimony of Mr. Randell that media files are stored at Akamai); DTX 305; DTX 306; PTX 96; 9/9/14 AM Tr. at 93.  Personal Audio failed to rebut this uncontroverted evidence or carry its burden of putting forward any facts demonstrating that Defendant makes or uses the allegedly infringing apparatus.

### (1)     Defendant Does Not Make the Accused Apparatuses and Is Not Vicariously Liable If CDNs Make the Accused Apparatus

Infringement based on making the accused system or apparatus requires the actual construction of the system or apparatus.  *N. Am. Phillips Corp. v. Am. Vending Sales*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) ("making" an accused apparatus is a "purely physical occurrence[]").  Where, as here, the alleged infringement occurs based on steps taken by multiple

3

parties, and where the defendant neither "directs nor controls" the other entities, there is simply no act of direct infringement under controlling Federal Circuit law. *See Limelight Networks Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2120 (2014); *Centillion*, 631 F.3d at 1287-88. The undisputed evidence establishes that the Defendant does not, acting on its own, make an infringing system or apparatus.

The Federal Circuit has held that vicarious liability applies only where "circumstances show[] that the liable party controlled the conduct of the acting party." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007). For example, an employer is liable for the acts of the employee within the scope of that employment. *See Engle v. Dinehart*, 213 F.3d 639, at *9 (5th Cir. 2000) (unpublished) (Dennis, J. concurring in part, dissenting in part) (cited by *BMC*, 498 F.3d at 1379). Conversely, an employer or principal "who hires an independent contractor is not vicariously liable for the contractor's tort or negligence." *Id.*[2] The level of "control" necessary to rise to the level of vicarious liability may be shown through an "agency relationship or joint enterprise," *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1363 (Fed. Cir. 2013), but not through "arms-length cooperation." *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008). Personal Audio has not established the level of "control" necessary to establish vicarious liability.

Personal Audio contends that Defendant exercises control over the third-party vendors. But "the mere fact that there is a contract" between Defendant and a third-party "is not sufficient" to establish vicarious liability. *Etmel, Inc. v. Lipidlabs, Inc*., 583 F. Supp. 2d 811, 839

---

[2] Further, "a contracting party is not vicariously liable for the actions of an independent contractor unless that party controls the details of the independent contractor's work to such an extent that the contractor cannot perform the work as he chooses." *Etmel, Inc. v. Lipidlabs, Inc*., 583 F. Supp. 2d 811, 837 (S.D. Tex. 2008).

(S.D. Tex. 2008).   In order to establish control, Personal Audio must have evidence that the relationship between the Defendant and the vendors is one that meets the standards for vicarious liability or that the Defendant controls the specific way in which the CDNs perform their work. Personal Audio has established neither basis for vicarious liability.

Personal Audio *does not specify* any place in the contracts with the CDNs where the Defendant is given the right to control the actions of the third parties in an agency-like relationship, and with good reason.   Where contracts exist, the relationship between the Defendant and the third-party CDN's is explicitly spelled-out as one of "independent contractors."   *See* (DTX 305) ("The parties are independent contractors."); *see also* DTX 306; PTX 96.   In the absence of any evidence to contradict the plain language of the contracts providing that these are independent contractor relationships, the relationship between Defendant and the vendors cannot support a finding of vicarious liability.   *See Etmel*, 583 F. Supp. 2d at 837; *Anascape, Ltd. v. Microsoft Corp.*, No. 06-cv-158, 2008 WL 7182476, *1 (E.D. Tex. Apr. 25, 2008) (noting summary judgment is appropriate where the movant shows that "the undisputed material facts affirmatively establish a right to judgment").   None of the contractual provisions discussed by Personal Audio's technical expert establishes any sort of relationship sufficient to establish vicarious liability.   9/9/14 AM Tr. at 79-88.

Nor does Personal Audio provide any evidence that the vendors have been instructed to operate their databases and servers in an infringing manner, or indeed that Defendant has control over how the CDNs choose to store and retrieve the media files at issue in this case.   Neither the contracts themselves nor any witness testimony suggests that the Defendant has any such level of input or control over the operations of the CDNs.   This is not surprising, as it would truly be 'the tail wagging the dog' for the Defendant to instruct a sophisticated party like Akamai on how to

operate its system for storing and retrieving files.  Personal Audio offered no testimony from Akamai in this case.  Instead, as Mr. Randell testified, CBS has no control over how or where Akamai chooses to store the media files.  *See, e.g.*, 9/10/14 PM Tr. at 23-29 (testimony of Mr. Randell); DTX 305; DTX 306; PTX 96; *see also* 9/9/14 AM Tr. at 122-23 (Dr. Almeroth admitting that CBS does not tell "Akamai what URLs it should use to receive and respond to requests from users for video streams").

In particular—and this point is dispositive—Personal Audio has adduced no evidence that Defendant can or does direct or control the CDNs choice or decision of "storing one or more media files … *at a storage location specified by a unique episode URL*," an express requirement of the asserted claims.  *BMC*, 498 F.3d at 1379 ("the law imposes vicarious liability on a party for the acts of another in circumstances showing that the liable party controlled the conduct of the acting party").  In fact, there is no evidence Defendant even knows how these third-parties purportedly store media files at a storage location specified by a unique episode URL, given the complexity of Akamai's proprietary methods for storing and efficiently delivering content over the Internet.  9/10/14 PM Tr. at 21-22 (testimony of Mr. Randell).

In short, Personal Audio has not demonstrated that Defendant controls the actions of these vendors in a way that is relevant to establishing vicarious liability for direct infringement. Personal Audio does not dispute that the vendors, and not the Defendant, make at least portions of the allegedly infringing apparatus.  As such, judgment as a matter of law is warranted that Defendant does not make an allegedly accusing apparatus.

(2)    **Defendant Does Not Use the Accused Apparatus**

Personal Audio has also failed to prove that Defendant uses an infringing product pursuant to § 271(a).  Under the governing law, as set forth in *Centillion*, Personal Audio has failed to adduce evidence that it is Defendant who puts the accused systems into use.

By the plain language of the claim, the apparatus described by Claim 31 is used when a user using a client device transmits a request to the processors, thereby causing the processors to respond to the request.  *See, e.g., Centillion*, 631 F.3d at 1284 ("in NTP, the end user was 'using' every element of the system by transmitting a message. It did not matter that the user did not have physical control over the relays, the user made them work for their patented purpose, and thus 'used' every element of the system by putting every element collectively into service"). Personal Audio has not shown that the Defendant itself "put the invention into service, i.e., control[s] the system <u>as a whole</u> and obtain[s] benefit from it."  *Centillion*, 631 F.3d at 1284 (emphasis added).  Defendant does not "put into service" an apparatus "using all portions of the claimed invention."  *Id.* at 1284–86.  In fact, Personal Audio concedes as much by admitting that the video files are stored at Akamai.  *See* 9/9/14 AM Tr. at 96 (noting files are stored at Akamai). Instead, Personal Audio contends that Defendant "uses" an infringing apparatus because the apparatus need only "be able to (1) 'receive a request from a client device.'"  Personal Audio's "use" arguments fail on several fronts.

First, as explained above, it is undisputed that Akamai and thePlatform make and control server-side elements of the allegedly infringing apparatus. 9/9/14 AM Tr. at 92-93 (Dr. Almeroth conceding that Akamai and thePlatform are part of the accused apparatus).  As such, Defendant does not "control the system as a whole," and therefore do not infringe.  *Centillion*, 631 F.3d at 1284.

Second, Personal Audio's argument fails under the plain language of the statute. Personal Audio has adduced no evidence that CBS itself acts to cause the entire apparatus to perform its functions.  How does one "use" an apparatus "to: (a) receive a request from a requesting device" if there is no request from a device?  In other words, Personal Audio has taken the 'use' out of the 'use' requirement.  For this reason, the Federal Circuit rejected this very argument in *Centillion*, 631 F.3d at 1286-87.  Indeed, in *Soverain Software LLC v. J.C. Penney Corp., Inc.*, 899 F. Supp. 2d 574 (E.D. Tex. 2012), the Court noted that the apparatus was used when Defendants "deliver[ed] web pages containing embedded programming."  *Id.* at 581.  Here, Personal Audio contends that the static existence of the apparatus is a "use."  Merely 'having' an allegedly infringing device, though, is not an infringing use under Section 271(a). Putting the entire apparatus into use requires a request for a media file and a response thereto, none of which are infringed by actions of CBS.

Third, Defendant does not "obtain benefit from" the static existence of the allegedly infringing device.  Rather, the apparatus provides benefits only when a user of a client device uses the system to obtain a media file.  Again, a media distribution system that does not distribute media benefits no one.  In those circumstances, it is the end user who "uses" the accused apparatus or system and obtains the benefit.  *Centillion Data Sys.*, 631 F.3d at 1284.

### 2. Personal Audio Failed to Provide Sufficient Evidence that Defendant Meets Each Element of the Asserted Claims

Judgment as a matter of law of non-infringement should also be entered, separately and independently, because Personal Audio has failed to prove that Defendant has made, used, or sold an apparatus meeting each element of the asserted claims.

### (1) URLs specifying the storage location

8

Claims 31-34 require "storing an updated version of a compilation file … containing … one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes."  Personal Audio failed to demonstrate a "URL specifying a storage location" in the accused compilation file because none exists.  As Dr. Porter explained, the only URL Personal Audio identifies does not specify the storage location containing the media file.  9/10/14 PM Tr. at 130-34; *see also* 9/9/14 AM Tr. at 100 (admitting that the "URL is not directly to the storage location").  That URL specifies a CBS server and when selected by a user brings back an HTML document for a specific episode.  *See* 9/10/14 PM Tr. at 12, 20 (testimony of Mr. Randell); *see also* 9/9/14 AM Tr. at 100.  That URL, which identifies a web page stored on the CBS server, cannot be a URL that specifies the storage location for a media file, because the media files are stored at Akamai.  The location of the media files is not sent to the user's computer until multiple other steps have occurred.  9/9/14 AM Tr. at 100 (Dr. Almeroth testifying that the URL only "kicks off the process" for locating the media files).  Personal Audio's expert conceded that if "specifying the storage location requires that there be something directly referencing the storage location in the URL that there would not be any literal infringement."  9/9/14 AM Tr. at 110.  Because that is precisely what the claim requires, Personal Audio cannot identify a URL "specifying the storage location of one or more corresponding media files," a requirement of the asserted claims.

There is good reason for the Defendant's non-infringing configuration.  If the storage location of a media file becomes public information, then the entity that produced the media file (i.e., CBS) would be vulnerable to unauthorized copying of the file. This is a significant issue for CBS, who, for obvious reasons, wants to maintain tight control over its valuable content.  9/10/14 PM Tr. at 21-24 (testimony of Mr. Randell).  And Defendant's configuration allows it to move the

storage location of the media files without having to change the URL.  9/10/14 PM Tr. at 20-22 (testimony of Mr. Randell).

In sum, Personal Audio does not and cannot identify a compilation file containing "one or more episode URLs specifying the storage locations of one or more corresponding media files representing said given one of said episodes."  Therefore Defendant does not literally infringe any of the asserted claims as a matter of law.

### (2)    Single Communication Interface

Claims 31-34 require "one or more processors … for … employing one of said one or more communication interfaces to [perform three functions (a), (b) and (c)]."  This Court has concluded that the "claim language itself establishes that the claim requires one interface for performing functions (a), (b), and (c)." (Dkt. 182, at 32).  Specifically, the three functions that the same interface must perform are: a) receiving a request from a client device for the recited compilation file, b) downloading the requested compilation file to the client device, and c) receiving and responding to a request from the client device for a media file identified by an episode URL included in the recited compilation file.  Personal Audio has failed to offer evidence that a single communication interface performs steps a, b, and c.   Therefore, judgment as a matter of law of non-infringement is appropriate.

Dr. Porter explained that a CBS server (i.e., a CBS host) associated with the hostname "www.cbs.com" receives the request message when a user points his browser to the alleged compilation file URL (step a), whereas an Akamai server host that is separate and distinct from the CBS server, receives and responds to requests for media content (step c).  9/10/14 PM Tr. at 137-40; *see also*  9/10/14 PM Tr. at 12-17 (testimony of Mr. Randell); 9/9/14 AM Tr. at 102-103; 124-25 (Dr. Almeroth). The CBS server and Akamai server are not connected to the Internet through the

same communication interface.  Specifically, steps (a) and (b) are performed by a CBS server connected to a communication interface, while step (c) is performed by a server at Akamai, separately connected to a communication interface.  9/10/14 PM Tr. at 137-40; *see also* 9/9/14 AM Tr. at 123-25 (Dr. Almeroth admitting that CBS performs steps A and B, and that Akamai performs in part step C).  Personal Audio's expert admitted that the response to the request for the media file in step c is performed by the Akamai server.  9/9/14 AM Tr. at 123-25.  Because *at least two* separate hosts are used to perform the three functions, at least two communication interfaces are used because each host will necessarily have its own communication interface (*e.g.*, a network interface card having an Ethernet interface) that enables the computer to transmit data to and receive data from the Internet.  9/10/14 PM Tr. at 137-40; *See also* 9/9/14 AM Tr. at 126 (conceding that if there are two communication interfaces, there can be no infringement).  Therefore, Defendant does not infringe and judgment as a matter of law is appropriate.

### B.    Personal Audio Failed to Provide Sufficient Evidence that Defendant Infringes Under the Doctrine of Equivalents

To support a finding of infringement under the doctrine of equivalents, Personal Audio "must have presented, on a limitation-by-limitation basis, particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test." *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 716 (E.D. Tex. 2011) (internal citations omitted). Generalized testimony is insufficient; rather, "[p] articularized testimony is essential, so that a patentee cannot under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Id.*  "Judgment as a matter of law of no infringement under the doctrine of equivalents is appropriate if no reasonable fact finder could determine that a claim

limitation is met in the accused device by a substantial equivalent." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980-981 (Fed. Cir. 1999).

Personal Audio has failed, as a matter of law, to establish that Defendant infringes under the doctrine of equivalents.  Personal Audio contends that with respect to a "URL specifying a storage location", if CBS does not infringe literally, it does so under the doctrine of equivalents. This argument fails because there are substantial differences between the accused system and the requirements of the claim.  As Dr. Porter explained, there is a significant difference between a URL that specifies the storage location of media files and a URL that must be specially processed by a system and then used to look up the storage location of media files.  9/10/14 PM Tr. at 130-37.  For example, URLs that specify a storage location are simple and would allow a user to easily access, and copy, the media file.  9/10/14 PM Tr. at 131-32 (testimony of Dr. Porter). On the other hand, a URL that is processed by a web server and then used to look up the storage location of media files requires a computer program to execute this process. 9/10/14 PM Tr. at 131-36 (testimony of Dr. Porter).

Personal Audio's "function-way-result" analysis is also flawed.  Dr. Almeroth incorrectly identifies the function of the episode URL as to "tell you what episode should be displayed." 9/09/14 AM Tr. at 55-56.  Instead, the function of the episode URL, as is plain from the claim language, is to *specify* the storage location of media files so that those files can be requested from the apparatus and then downloaded to the client device.  The alleged episode URLs as used by the accused device, however, perform a different function. The alleged episode URLs do not identify or request media files.  Instead they simply navigate the user to an HTML document that loads a separate video player application that enables the streaming of the episode content from the Akamai content distribution system. 9/10/14 PM Tr. at 12-13 (testimony of Mr. Randell).  It is

the video player, and not the episode URL, that is responsible for determining the relevant media files.  9/10/14 PM Tr. at 13-17 (testimony of Mr. Randell).

Second, even if you assume that episode URLs perform the same function in both the asserted claims and in the accused device, the way in which they perform that function is quite different.  The claimed apparatus receives a request for one or more media files stored at a location specified by a corresponding episode URL.  In the accused system, the URL, when selected by a user, brings back an HTML document for a specific episode, which contains, among other things, code for the user's browser to fetch and load a video player. 9/10/14 PM Tr. at 12-13.  Next, the video player sends a request to another third party, thePlatform, that returns a file.  The video player processes that file and sends a request to Akamai, a different third party, which returns a file.  Finally, the video player processes this file to receive numerous blocks of media data from Akamai.  9/10/14 PM Tr. at 12-17 (testimony of Mr. Randell).  The way episode URLs are used in the asserted patent make the location of the media files known to any user assessing the media content. The way URLs are used in the accused device, in contrast, obfuscates the location of the media files from the user.  9/10/14 PM Tr. at 21-24 (testimony of Mr. Randell)

Finally, the result is different.  The claimed apparatus requires a predetermined URL that identifies a storage location to download a compilation file.  In the accused apparatus, on the other hand, the URL "kicks off" a multi-step process that, depending on the user's location and a host of other variables, streams multiple video files from multiple locations.  9/9/14 AM Tr. at 108 (conceding that sometimes the URL leads to one location, and sometimes to another storage location); 9/10/14 PM Tr. at 16-18 (testimony of Mr. Randell explaining how the video files are streamed from multiple locations and multiple files from Akamai)

**C.    Personal Audio Failed to Provide Sufficient Evidence that Defendant Infringed Under a Correct Construction of "downloading" or "episodes"**

Defendant contends, as it did during the claim construction process, that "downloading" as used in the '504 patent means "transferring/transfer the file … to the requesting client device for non-temporary storage and later use." (Dkt. 86) at 9.  Under the ordinary and customary meanings of "downloading" and "streaming," downloading a file to a computer requires that the file be transmitted to the computer and stored at the computer so that the file can be used at a later time, whereas streaming a file to a computer allows the computer to play the file only while it is being received, but no trace of the file is left on the computer after the file is played.  *See, RealNetworks, Inc. v. Streambox, Inc.*, No. C99-2070P, 2000 U.S. Dist. LEXIS 1889, *3-4 (W.D.Wash. Jan. 18, 2000) ("When an audio or video clip is 'streamed' to a consumer, no trace of the clip is left on the consumer's computer . . .. Streaming is to be contrasted with 'downloading,' a process by which a complete copy of an audio or video clip is delivered to and stored on a consumer's computer."); Declaration of Adam A. Porter, Ph.D. to Dkt. 86 ("Porter Declaration"), at ¶ 20 (defining "streaming" as "transmitting . . . data to a client that merely stores the data temporarily so that the client can process and output the data upon receipt.").  As explained in *RealNetworks*, "[o]nce a consumer has downloaded a file, he or she can access the file at will."  2000 U.S. Dist. LEXIS 1889 at *3-4.

The specification supports construing "downloading a data file" in accordance with its ordinary and customary meaning.  The specification states that providing a subscriber with the ability to load audio programs into an audio player and then play those audio programs upon request at a later time is a key feature of the alleged invention.  '504 patent at 8:62-9:11 (describing that audio program segments are stored in "the local mass storage unit [of the player device]" so as to "enable the user to easily move from program segment to program segment,

skipping segments in a forward or reverse direction, or to jump to a particular segment, and thus alter the preprogrammed sequence").

The specification also provides that <u>downloading</u> the audio programs from a server is the mechanism used to load the audio programs into the audio player.  *See, e.g.*, *id.* at 8:37-42 ("[T]he download file [is] . . . moved from storage unit 145 [in the host server] . . . into local storage at 107 in the client/player."). That is, the specification makes clear that downloading audio programs necessarily results in those programs being stored for later use.

For example, the specification states,

[i]n accordance with <u>the invention</u>, it is desirable to download the equivalent of a full session's programming in addition to the currently scheduled session programs so that, in the event of a temporary communication link or host failure, programming will be nonetheless be <u>available</u>.

*Id*. at 23:57-61 (emphasis added).  Such data cannot be available unless it is stored.

As another example, the specification states, "the subscriber may wish to designate for future play a program segment <u>already loaded into the player 103 by virtue of a prior download</u>," *id*. at 18:60-62 (emphasis added), and further states, "hyperlinks of this type may be used to identify program segments which are <u>not available in the player 103 because they were not downloaded</u> for inclusion in a scheduled session." *Id.* at 14:55-57 (emphasis added).  The specification's teachings are clear that when a program segment is downloaded to the player the segment is stored so that it is available whenever the user requests it.

This teaching is further confirmed by figure 2, which "illustrates the sequence of major events which are executed [by] the program dissemination system contemplated by <u>the invention</u>." *Id.* at 8:17-19 (emphasis added).  Figure 2 and the description thereof discloses that: (1) the audio programming and program sequence is first "download[ed]" to the player (step 207) (*i.e.*, "moved from storage unit 175 [within server 101] into local storage at 107 in the

client/player 103"), (2) the user is then given an opportunity to edit the program sequence (step 211), and (3) after the downloading step the player will play the audio programming "at the request of the user" (step 212).  *Id.* at 8:20-64.  This request from the user could come anytime, anywhere, even when the user is driving in a car and disconnected from the program dissemination system.  *Id.* at 23:62-24:3 ("In installations which utilize download information to a removable media cartridge or a transportable player which is then played back in an automobile or elsewhere, and hence disconnected from the data link to the host, it will of course be necessary to complete the download prior to the disconnection."); *see also id.* at 7:58-8:8 (disclosing that, to facilitate use of the system in an automobile, "the files downloaded from the host may be stored on a replaceable media, such as an optical disk cartridge, which may then be inserted into a portable computer or simplified player for mobile use.").  The specification criticizes "conventional Internet radio players [as being] impractical for routine desktop use, and wholly unsuitable for use by an automobile drive[r]."  *Id.* at 2:8-10.

The specification consistently and unambiguously teaches that a key feature of the invention is the ability to: (1) move program segments into the local mass storage unit of a player device by virtue of downloading the program segments from a server; and (2) play those program segments whenever and wherever desired.

The prosecution history of the '504 patent confirms that "downloading data" does not include "streaming data."  During prosecution the patentee distinguished claim 31 (the only asserted independent claim) from prior art on <u>the basis that the prior art disclosed streaming media content to a user's device, rather than storing the media content in the device</u>.  The patentee stated,

> [the art] does not <u>store</u> either media content or the episode table of
> contents on the client workstations 600, but instead <u>streams</u> this

information to the workstations from central storage in response to client requests.

Ex. D to Dkt. 86 (January 2011 Amend.), at 19 (emphasis added).[3]

Dictionary definitions of the term "downloading" produced by Personal Audio in this case are consistent with the proposition that "downloading a file" to a computer requires that the computer not only receive the file but also store the file. *See* Ex. H to Dkt. 86 (The Free Dictionary) (defining downloading as the transferring of data "into the memory of [a] computer system.") (emphasis added).   Additionally, many dictionaries, including those produced by Personal Audio, define "downloading" as the transfer of a copy of a file from one computer to another, *see* Ex. I to Dkt. 86 (Microsoft Computer Dictionary), and define a file as "a collection of related computer data or program records stored by name."  *See* Ex. J to Dkt. 86 (Websters) (emphasis added).

In sum, downloading requires that the file be stored on a client device.   Defendant, though, streams the media files.  *See, e.g.*, 9/10/14 PM Tr. at 16-29 (testimony of Mr. Randell explaining how the video files are streamed from multiple locations and multiple files from Akamai); 9/9/14 AM Tr. at 95.  This means that the video player discards the video data after it plays the video.  Under this construction, there is no infringement of the asserted claims that all require downloading.  *800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354, 1366 (Fed. Cir. 2008) ("When a patent infringement verdict is based on an incorrect claim construction, [the Federal Circuit will] reverse the trial court's denial of a motion for judgment as a matter of law if no reasonable jury could have found infringement under the proper claim construction.").

---

[3] While this statement and the statements that follow were made in sections of the Amendments addressing either claim 1 or claim 8, Personal Audio told the Patent Office that "claim 31 is believed to be allowable for the same reasons advanced above with respect to claims 1 and 8." Ex. C to Dkt. 86 (Sept. 2010 Amend.) at 22; Ex. D to Dkt. 86 (Jan. 2011 Amend.) at 29; and Ex. E to Dkt. 86 (July 2011 Resp.) at 14-15.

Likewise, Defendant contends that "episodes," as used in the '504 patent, means "audio programs." The specification of the '504 patent makes plain that the claimed invention is an audio player that plays episodic audio files and the accompanying audio program delivery system. Personal Audio's attempt to broaden the term "episodes" to include "a television show" is contrary to the specification.

Claims should be read first and foremost in light of the specification, which is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1321. "In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). When the patent specification "describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *see also AstraZeneca AB v. Hanmi USA, Inc.*, No. 2013-1490, 2013 WL 6670610, at *3 (Fed. Cir. Dec. 19, 2013) (claim terms limited to six cations enumerated in the "present invention" description even though the claims contained no such enumeration); *Retractable Techs.*, 653 F.3d at 1305 (limiting claimed "body" to a one-piece structure in light of specification's description of "the invention" as a one-piece body even though claims contained ambiguity as to whether "body" could be two pieces).

Here, the specification repeatedly and expressly describes the invention as one for playing audio files and the episodes as audio programs. The Abstract describes the invention as an "audio program and message distribution system." The Background of the Invention states that the invention's object is "to provide easy access to rich selection of audio programming …."

18

'504 patent at 2:11-17.  The Summary of the Invention states, "[t]he present invention takes the form of an audio program player which automatically plays a predetermined schedule of audio program segments . . .."  *Id.* at 2:20-25.  Nowhere in the Summary of the Invention is video or episodic content other than audio even mentioned.  *Id.* at 2:21-4:6.  In fact, throughout the specification, "episodes" and "media file" refer to audio files.  *See id.* at 2:11-17; 2:21-56; 2:57-63; 3:40-42; 5:63-6:2; 6:22-31; 19:36-58; 12:39-61; 19:61-62; 28:17-18; 38:42-44; 36:10-25; 39:36-45; 40:05-08; Fig. 1, element 131.  Indeed, one of the key aspects of the invention described in the specification is that the programming could be selected "without the need for a visual display screen."  *Id.* at 2:11-17.  If selecting content and navigating without the need for a visual display constitutes a key aspect of the invention, then the invention cannot be for displaying television shows.  Reading "episodes" in light of the specification, as required by the Federal Circuit, confirms that, because the invention is an audio player system that plays audio files, the claimed "episodes" are audio programs, not television shows. *See Phillips*, 415 F.3d at 1321; *Verizon*, 503 F.3d at 1308.

In addition, in one of its dependent claims, the invention of claim 31 is characterized as one directed to audio programs.  Claim 35, which depends indirectly from claim 31, uses the descriptor "audio program player" to refer to the apparatus claimed in claims 31, 33 and 34 and requires that the compilation file "further includes displayable text describing said series of episodes."  That claim language indicates that the patentee views the apparatus of claim 31 as directed to playing episodes of audio programs, consistent with the teachings throughout the specification.

The accused CBS television episodes streamed to end users are plainly videos, and not "audio programs."  Therefore, under this construction, there is no infringement as a matter of law.

## IV.  CONCLUSION

For the above reasons, Defendant respectfully requests that this Court find that Defendant has not infringed the asserted claims as a matter of law.


Dated:  September 14, 2014                    Respectfully submitted,

                                              */s/ Jennifer Parker Ainsworth*
                                              Jennifer Parker Ainsworth
                                              Texas State Bar No. 00784720
                                              jainsworth@wilsonlawfirm.com
                                              Wilson, Robertson & Cornelius, P.C.
                                              One American Center
                                              909 ESE Loop 323, Suite 400
                                              Tyler, TX 75701
                                              (903) 509-5000 (telephone)
                                              (903) 509-5092 (facsimile)

                                              Steven Lieberman
                                              slieberman@rothwellfigg.com
                                              Sharon L. Davis
                                              sdavis@rothwellfigg.com
                                              Brian S. Rosenbloom
                                              brosenbloom@rothwellfigg.com
                                              Jennifer Maisel
                                              jmaisel@rothwellfigg.com
                                              Rothwell, Figg, Ernst & Manbeck, PC
                                              607 14th Street, N.W., Suite 800
                                              Washington, DC 20005
                                              (202) 783-6040 (telephone)
                                              (202) 783-6031 (facsimile)

                                              *Attorneys for Defendant*
                                              *CBS Corporation*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this notice was served on all counsel who have consented to electronic service, Local Rule CV-5(a)(3), on September 14, 2014.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth